KYNE v. SOUTHERN PACIFIC COMPANY et al.

No. 2350.   Decided July 31, 1912 (126 Pac. 311).

1. RAILROADS—PERSONS ON TRACK—ACTION FOR COLLISION—EVI-
    DENCE—ADMISSIBILITY.   In an action against a railway com-
    pany for injury to the child of an employee, who was struck
    by a train, evidence, not only that she and members of her
    family had customarily crossed the track at that point in going
    from a depot to a water tank at which the company supplied
    the family with water for domestic use, but that other persons
    had crossed on similar occasions and under similar circum-
    stances, was admissible under the complaint, which alleged
    substantially, though inartifically, facts imposing a legal duty

on the company to use ordinary care to maintain a lookout for persons who might be expected to be about the track at that point, and to give timely signals.   (Page 374.)

2. RAILROADS—DUTY TO PEDESTRIANS.   Where persons customarily crossed a railroad track in going to a water tank, where they were provided by the railroad company with water for domestic use, the company in operating its trains was bound to use ordinary care to maintain a lookout to discover the presence of such persons as might naturally be expected to be at that point, and give them timely warnings or signals of the approach of a train.   (Page 376.)

3. RAILROADS—INJURY TO PEDESTRIAN — NEGLIGENCE — EVIDENCE— SUFFICIENCY.   In an action against a railroad company for injury to a child, struck by a train while crossing the track at a point customarily used by pedestrians, evidence *held* to warrant a finding of negligent failure to maintain a lookout and give timely warnings or signals.   (Page 376.)

4. RAILROADS—INJURY TO PEDESTRIAN—CONTRIBUTORY NEGLIGENCE— JURY QUESTION.   In an action against a railway company for injury to a child while crossing a track, whether she was guilty of contributory negligence *held*, under the evidence, a jury question.   (Page 376.)

5. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—CHILDREN.   The question whether a ten and a half year old child was guilty of negligence contributing to her injury is to be determined by consideration of the care that an ordinary child of her age, intelligence, and experience would have used.   (Page 376.)

6. RAILROADS—INJURY TO PEDESTRIAN—LICENSEES.   The child of a railway employee was not a trespasser or bare licensee in crossing a track to procure water for use of her family, provided by the railway company at a tank.   (Page 377.)

7. RAILROADS—INJURY TO PEDESTRIAN—LAST CLEAR CHANCE.   In an action against a railway company · for injury to a child, who was struck by a train, existence of a duty to maintain a reasonable lookout to discover persons who might be near the track, and a clear view of the track in advance of the moving train, rendered applicable an instruction on the last clear chance doctrine.   (Page 377.)       ·.

APPEAL from District Court, Second District; *Hon. J. A. Howell,* Judge.

Action by Nora A. Kyne, a minor, by P. C. Kyne, her guardian *ad litem,* against the Southern Pacific Company and another.

41 Utah 24

Judgment for plaintiff. Defendants appeal.

AFFIRMED.

*Parley Williams, Geo. H. Smith* and *F. K. Nebeker* for appellants.

*Joseph Chez* and *Willis & Devine* for respondent.

STRAUP, J.

This is an action to recover damages for personal injuries alleged to have been sustained through the defendants' negligence. A verdict was rendered for the plaintiff. The defendants appeal.

The assignments relate to the admission of certain evidence, the court's refusal to direct a verdict in the defendants' favor, and to the charge.

The accident occurred at Lakeside, a station in Box Elder County on the west shore of the Great Salt Lake on the defendant company's main line. The residents of the station consisted of ten or fifteen families and about 300 men, employees of the defendant Southern Pacific Company. The plaintiff was between ten and eleven years of age. Her father was in the employ of the company and with his family resided at Lakeside. At that place there were three tracks running east and west. The main track was about thirty feet north of the depot. Between that track and the depot were two other tracks, one of them a passing track, and the other leading to a quarry about a quarter of a mile away, where the company was engaged in quarrying, and where plaintiff's father was employed as a powderman. At Lakeside a boarding house and bunkhouses of the employees were on the north side of the tracks, and the houses of families on the north and south side. The house of the plaintiff's father was on the north side, about 300 yards west of the depot. The country at Lakeside is very arid, and without water for drinking and culinary purposes. The company supplied its employees and those residing at Lakeside with water, and for

that purpose maintained a large tank east of the depot and south of the tracks, which it kept filled with water transported by it from Lemay, about thirty miles away. A pipe line from the tank to the boarding house supplied the boarding house with water. Those of the families living in separate houses got water direct from the tank and carried it to their houses. The station and tracks were unfenced, and persons on the north side of the tracks, in going to and from the tank and depot, were obliged to cross the tracks. Plaintiff's father testified:

"In passing from my home to the depot, we used to use the pathway between the two tracks, the main line track and the one that the quarry came up and down on. We had to cross the tracks going south. We would go about 160 yards east; then the path turns south and terminated at the depot. During the time I lived there, we obtained water from the tank at the depot on the south side of the railroad tracks. During the time I lived there, I carried water from this well to the house noon and evening, when I came off work. I carried it in two buckets. I was then in the employ of the Southern Pacific Company as a powderman, blasting boulders too large to be handled by the steam shovel. I would come in to my noonday meal on the work train, and had been doing that for over a year. Before the 5th day of April, 1910 (the day of the accident), I had been in the habit of getting the water when I came in at noon in buckets left at the well by Nora (the plaintiff). She went to the well probably twice every day from December, 1909, until she got hurt. I also obtained the water every evening. Nora brought me the buckets. After getting the water, we would cross the tracks, then go straight west until I came to another trail, and then go up over the hill and go home. On the day of the accident, I was at the quarry blasting. It was between twelve and one o'clock, and I was working during the noon hour. When I got through working (that day he did not come down on the work train as usual), I came down about half past twelve, and saw a crowd running out toward the depot."

The work train which caused the injury came in from the quarry from the west. The first car as it approached was the caboose, then a water car, then the engine, then a flat car. The train stopped near the depot. There the train crew and the employees coming from the quarry left it and went to lunch at the boarding house. Shortly thereafter the defendant Jensen, the switch foreman of the work train, and who had direction and control over it, alone boarded the engine, and, without assistance and without signals or warning, ran and operated the train to a switch to the east of the depot, and there switched the train to another track, and, without warning or signals of its approach, ran it back towards the west on another track and struck the plaintiff, who was standing near the south rail of that track, and near the depot, looking towards the west for her father. The plaintiff testified that she took the buckets to the depot for her father, and "when I got there I set the buckets down in front of the depot, and went to Healy's (near by) to get some salt. I got the salt and came back to the depot. I saw the train when it came in. The train stopped. I saw the fireman and engineer get off. I knew them. My brother went around to the pump (tank) with the buckets to fill them. When I gave the buckets to my brother, I was on the side next to the tracks. I then went close up to the track to look for Papa, because he had not come in on that train. I was, I guess, three or four feet from the depot building. When I first saw the train, it was about fifty or sixty feet towards the quarry from the depot, and was standing still. I did not see it after that. A flat car struck me on the breast, and dragged me about twenty or thirty feet. I was on the ground while being dragged. I did not see whether a train was moving before I got back from Healy's. I went within one foot of the track. Before reaching that point, I did not look to see if a train was coming. I listened for a train. I looked westerly to see if a train was coming from that direction, but not easterly. I stayed in the place where the car struck me three or four minutes. When my brother went to get the water, I was close to the depot; but I did not have

any conversation with him. I did not hear any whistle sounded at the time the train moved from the place where my brother got off the engine. I was behind the freight depot when the train stopped; but I saw it when my brother got off. It stopped towards the quarry from the boarding house. I could not see the train on account of coal cars and the thing they had there to load coal on engines with. But these objects were not between me and the train at the time the men were getting off. I know that the train was moved. I know where it always went when it came in; it had to switch in for coal, and went down on that track for a little ways below the depot towards the lake, and then it had to come up on another track. That is the way that train always took on coal." Her foot was run over and amputated back of the toes.

Her brother testified that when the train came in he saw his sister; that he got off the train, took the buckets, and "went around the corner to the pump. I pumped the water and started back to where my sister was. I saw her being dragged as I came around the corner. She was lying on her back. She was next to the flat car, her head towards the depot. I did not hear any bell or whistle, I became aware for the first time that the train was in that locality when I turned around with my buckets, because I had not heard it make any noise up to that time. It was moving about as fast as I could run. When I saw my sister, I dropped the buckets and ran toward the engine and gave the stop signal to Jensen. I hollered to him. He was running the engine. He was in where the engineer sits when he runs the engine, on the north side, kind of kneeling down on the seat. I did not see any one else except Jensen. I told him to stop; that my sister was under the train. He looked towards me. When I first hollered at him, he was looking in front of the engine; but he turned around and looked toward me. He did not say anything to me after I hollered to him. After I gave the stop signal and hollered, the train traveled about as far as across this room, east and west, and then my sister got loose from the car (her foot becoming detached from the

shoe). At the time I gave the signal to stop, Jensen was looking towards me. I was right by the steps that go up to the cab of the engine. I moved along with the train, and quit running when my sister got out from under the train."

The train was not stopped until it reached its destination. There Jensen left it, went to his home, and then came back where the plaintiff was. She had ordinary intelligence of one of her age, knew the difference between a passenger and a freight train, and testified that she customarily looked and listened for trains, and that on the day she was injured and on her way to the well she looked in both directions before going on the track, and, "before stopping on either of the tracks, or very close to them, I looked and listened for the purpose of seeing whether trains were coming," but she did not look easterly, only westerly, for trains, after she got back from Healy's, and when she stepped to the south track looking for her brother.

The foregoing is, in substance, the evidence adduced by the plaintiff. The defendants offered no evidence.

Several witnesses for the plaintiff were permitted to testify, over the defendants' objections, that not only the plaintiff and members of her family had customarily crossed and traveled the railroad tracks in going to and from the depot and the water tank, but that children of other families and other persons residing at Lakeside had also done so on similar occasions and under similar circumstances. This was objected to as not being within the issue. Counsel concede that the evidence would have been proper, had there been averments in the complaint of such facts, but assert the complaint contains no such averments. The complaint is not a model, and is rather wordy and inartificial. But the facts in respect of the station, tracks, and physical conditions at Lakeside, the situation of the water tank, the transportation and supply of water by the company for the use "and needs of its employees" at Lakeside, the employment of plaintiff's father, the situation of his residence with respect to the tracks, depot, and tank, the custom and practice of the plaintiff, her father, and members of his

family traveling along and across the tracks to and from the water tank to obtain water, the company's knowledge thereof, the negligent operation of the train without warning notice or signal, the defendants' failure to observe the presence of plaintiff "at said time and place, and to operate said engine and cars with reference thereto, under the conditions attending the custom, and the practice of the use permitted to be made of said tracks by plaintiff and others, as aforesaid," the collision and injury, and the failure to stop the train upon knowledge that the plaintiff had been struck and was dragged, were all alleged. We think the complaint contains sufficient averments of facts to show that in the operation of trains and cars at the place in question a legal duty was imposed on the company and its agents and servants to use ordinary care to observe a lookout for the presence of persons who, under the circumstances, might naturally be expected to be about the station and tank, and to give timely signals and warnings of the movements and approach of cars and trains. As bearing on that duty, it was proper to show the customary use that had been made of the premises, not only by the plaintiff, her father, and members of his family, but also by others on similar occasions and under similar circumstances, without direct allegations that others had so used the premises. The facts and circumstances that were alleged were averred to show that a legal duty was imposed on the defendants, in the operation of cars and trains about the station and water tank, to use care and to observe a lookout for the presence of those who might naturally be expected to be about the station and tank, and to give them signals and warnings of the approach of trains and cars, and the evidence which was objected to and received but related to that duty. This is not a case where facts are alleged showing a definite or precise duty to use a particular kind or degree of care, and where evidence was received showing a different or other duty, or different or other care. The evidence objected to was evidence tending to show the particular and precise duty and care alleged. We think no error was committed in receiving it.

At the conclusion of plaintiff's evidence, the defendants requested a direction of a verdict in their favor, on the grounds that there is no evidence to show (1) that any duty was imposed on the defendants in the operation of cars and trains to observe a lookout for persons about the station and water tank, or to give signals and warnings; (2) that the person operating the train, in the exercise of ordinary care, could have known or discovered the presence of plaintiff; (3) that the defendants, or either of them, were negligent; and (4) that the evidence conclusively shows that the plaintiff was guilty of contributory negligence.

Upon the facts heretofore referred to, we think a duty was imposed on the defendants in the movement and operation of the train, under the circumstances, to use ordinary care in observing a lookout, and to discover the presence of persons who might naturally be expected to be about the station and water tank, and to give timely warnings or signals of the approach of the train. We also think there is evidence to show that that duty was negligently performed. Upon the evidence the jury was justified in finding that Jensen, in operating and switching the train, did not use ordinary care in observing a lookout, and that he gave no signal or warning of the movement and approach of the train, and that ordinary care, under all the circumstances, required him to do so.

We are not prepared to say that the plaintiff was guilty of negligence as matter of law. We think the question was one of fact for the jury. Her conduct in that regard is to be measured by that of the ordinary child of her age, intelligence, and experience. When she first approached and crossed the tracks, she looked for approaching trains. She, in taking the buckets to the depot for her father, who was expected to be on the train about to arrive from the quarry, was rightfully about the premises. She saw the train come in. She saw it stop, and the train crew leave it. She was to the south of the tracks, near the depot, expecting and looking for her father. For that purpose she stepped close to the south rail of the south track, and was look-

ing to the west—the direction from which her father was expected to come. She was then in a position where she could not see the work train. The last she saw of it, it was standing on a track to the north of her. Without notice or warning, Jensen propelled it to the east, switched it to another track, near where the plaintiff was, and, without warning or notice, propelled it towards her and struck and dragged her twenty or thirty feet. We think plaintiff's negligence, like that of the defendants, was one of fact for the jury.

The defendants requested the court to charge:

"The court charges you that the defendants had the right to assume and act on the assumption that the track at the point of said accident was clear, and that no one would be trespassing thereon. Accordingly, neither of the **6, 7** defendants was under any duty to watch or keep a lookout for a mere trespasser at said place, unless the said Jensen, who was then and there operating said train, had actual knowledge or notice of the presence of such trespasser. The court charges you that the rule in this respect is the same in the case of children of tender years as in the case of adult persons."

The court refused the request, and charged:

"The court charges you that, if you find by a preponderance of the evidence in this case that the place at which the plaintiff was injured was a place which, by reason of its situation and the conditions surrounding it, and the usage made of it to the knowledge of the defendants, as shown by the testimony, was such a place that the presence of people thereat might be reasonably anticipated by the defendants in this action, then you are instructed that the defendants were under a duty, in operating engines, cars, and trains thereat, to be on the lookout for such people at said place, and to give timely warning of the approach of trains thereat, and that the failure to do so on the part of the defendants, if you find by a preponderance of the testimony there was such a failure, would constitute negligence; and if you further find, by a preponderance of the evidence, that such failure was the proximate cause of the injury to the plaintiff in this action—

that is to say, if you find, by a preponderance of the evidence, that except for such failure the plaintiff would not have been injured—then the court charges you that the plaintiff would be entitled to recover in this action, unless you find that she was guilty of contributory negligence (that is, such negligence that except for it the plaintiff would not have been injured); or unless you find that, notwithstanding such contributory negligence on the part of the plaintiff, the defendants discovered the plaintiff in a position of peril in time, by the exercise of ordinary care upon their part, to have prevented the injury to the plaintiff, and that such failure to exercise ordinary care on the part of the defendants was the proximate cause of the injury to the plaintiff (that is, that except for such failure plaintiff would not have been injured)."

Complaint is made of this. Under the facts, the plaintiff was neither a trespasser nor a bare licensee. The duty and care which the defendants owed her are not to be measured by such a relation. The request was properly refused. The further criticism made of the charge pertains to the latter portion, and which relates to the last chance doctrine. It is urged there is no evidence to justify the submission of the case on such a theory. The testimony of the plaintiff's brother, the continuing duty of Jensen to observe a reasonable lookout to discover persons who might be expected to be about the depot and premises, and his clear view of the track in advance of the moving train, rendered the charge applicable.

We think the judgment of the court below ought to be affirmed. It is so ordered. Costs to respondent.

FRICK, C. J., and McCARTY, J., concur.